# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| MARN, INC.,<br>     Plaintiff, | No. 3:24-cv-766 (SRU) |
| v. |  |
| AURORA MACHINE, LLC,<br>     Defendant. |  |

## ORDER ON MOTION TO DISMISS AND MOTION TO STAY DISCOVERY

MARN, Inc. ("MARN") sued Aurora Machine, LLC ("Aurora") on four counts arising from a Manufacturer Representative Agreement: (1) breach of contract; (2) violation of the Connecticut Sales Representatives' Commissions Act (the "Commissions Act"), Conn. Gen. Stat. § 42-481, *et seq.*; (3) unjust enrichment; and (4) quantum meruit. *See generally* Doc. No. 1. Aurora filed a motion to dismiss the first and second counts of MARN's complaint for failure to state a claim, or, in the alternative, to compel arbitration. *See generally* Doc. No. 22. For the reasons set forth below, Aurora's motion to dismiss or compel arbitration is **denied**. Further, Aurora's motion to stay discovery is **denied as moot**. Doc. No. 27.

## I.    Background

MARN is a Connecticut corporation with its principal place of business in Middlebury, Connecticut. Doc. No. 1 at ¶ 1. MARN acts as an independent sales representative for manufacturers in a variety of industries. *Id.* Aurora is a New York limited liability company comprised of two members. *Id.* at ¶¶ 2, 5. Aurora's principal place of business is in Rochester, New York, and both members of the company are domiciled in and are citizens of New York. *Id.*

The following facts are drawn from MARN's complaint and are accepted as true for purposes of this order. MARN alleges it entered into a Manufacturer Representative Agreement ("the Agreement") on or about June 9, 2021 with non-party VI Manufacturing, Inc. ("VI Manufacturing"). Doc. No. 1 at ¶ 8. The Agreement appointed MARN as VI Manufacturing's "exclusive independent sales representative to promote the sale of and solicit orders for all of its products and services ('the Products')" in and to designated areas and entities collectively referred to as "the Territory."[1] *Id.* at ¶ 9. *See also* Exhibit A, Doc. No. 1-1 at ¶¶ 1-3 ("Exhibit A"). "The Agreement required VI Manufacturing to pay MARN a commission of five percent (5%) of the net invoice price of all Products on all orders from the Territory accepted by VI Manufacturing, regardless of how or by whom such orders were transmitted to VI Manufacturing . . . ." Doc. No. 1 at ¶ 10. *See also* Exhibit A at ¶ 4. Orders covered by the Agreement included follow-on, blanket, and requirements orders. Doc. No. 1 at ¶ 10; Exhibit A at ¶ 4. Additionally, the Agreement required VI Manufacturing to pay MARN "a business development fee" if monthly commissions "did not equal or exceed $2,000 per month" during the first two years of the Agreement's term. Doc. No. 1 at ¶ 11. *See also* Exhibit A at ¶ 7.

The Agreement's initial term was two years "and was expressly deemed to be binding upon the parties' successors and assigns." Doc. No. 1 at ¶ 13. *See also* Exhibit A at ¶ 12(a). Further, the Agreement "shall renew automatically for successive one (1) year periods . . . unless either party notifies the other, in writing, of its intention not to renew at least ninety (90) days before the expiration of the Initial Term or any Renewal Term." Exhibit A at ¶ 12(a). *See also*

---

[1] The Agreement defines "the Territory" as: "(i) the States of Connecticut, Massachusetts, Rhode Island, New Hampshire, Vermont, Maine, lower New York State (including Rockland and Westchester counties, and Long Island, New York; (ii) existing customers of VI Manufacturing which were identified in the Agreement, and (iii) customers identified by MARN which were outside the aforementioned exclusive territory and which were approved by VI Manufacturing." Doc. No. 1 at ¶ 9. *See also* Exhibit A, Doc. No. 1-1 at ¶ 2.

Doc. No. 1 at ¶ 14.  The Agreement provided that upon its expiration or termination, MARN would:

> (i) [B]e paid commissions on all orders which were dated or communicated to VI Manufacturing prior to the effective date of the Agreement's expiration or termination; (ii) be paid commissions on orders communicated to VI Manufacturing subsequent to the effective date of the Agreement's expiration or termination for an additional term, which was dependent upon the duration the Agreement had been in effect as of the time of termination, and (iii) continue to be paid commissions on a declining scale over a period of five (5) years with respect to Products being purchased by customers pursuant to blanket or requirement orders, by monthly, annual or multi-year orders, and by follow-on agreements to purchase Products that were originally selected by customers within the Territory during the term of the Agreement.

Doc. No. 1 at ¶ 15.  *See also* Exhibit A at ¶ 13.

Aurora acquired VI Manufacturing in or about October 2021.  Doc. No. 1 at ¶ 16.  Aurora allegedly assumed VI Manufacturing's rights and obligations under the Agreement, to which MARN consented.  *Id.* at ¶ 17.  MARN alleges its consent to Aurora's assumption of the Agreement is evidenced by "documents and communications exchanged between the parties, as well as their course of dealing and conduct."  *Id.*  These communications between MARN and Aurora included virtual and in-person meetings involving discussions of "sales representation and sales and marketing strategy."  *Id.*  Aurora allegedly requested MARN to "immediately schedule visits/meetings with customers and prospects in the Territory, which MARN did."  *Id.*  "Thereafter, MARN provided its professional services to, at the request of, and for the benefit of Aurora, with its knowledge and consent."  *Id.*

"Aurora utilized MARN as its exclusive sales representative within the Territory" after Aurora acquired VI Manufacturing.  Doc. No. 1 at ¶ 18.  Additionally, Aurora continued to pay MARN the Business Development Fee and commissions on orders from the Territory as

specified in the agreement.[2] *Id.* at ¶¶ 19-20.  Aurora paid MARN commissions on orders "comprised of both VI Manufacturing's pre-sale portfolio of products and services, as well as Aurora's products and services." *Id.* at ¶ 20.  Further, Aurora "provided MARN with samples, catalogs, literature and other material necessary for the proper promotion and solicitation" of Aurora's products. *Id.* at ¶ 21.

Neither MARN nor Aurora provided written notice of their intention not to renew the Agreement at least 90 days "prior to the June 9, 2023 expiration of the initial two-year term." Doc. No. 1 at ¶ 23.  Therefore, pursuant to its terms, the Agreement automatically renewed for an additional one-year term ending on June 9, 2024. *Id.* at ¶¶ 22-23.  However, on September 14, 2023, Aurora "advised MARN of Aurora's decision to terminate the Agreement, effective immediately." *Id.* at ¶ 24.  MARN responded on September 15, 2023, notifying Aurora in writing that:  (1) Aurora's termination of the Agreement constituted a breach; (2) "MARN remained ready, willing and able to perform under the parties' Agreement;" and (3) "Aurora [was] on notice of its continuing obligation to pay MARN commissions due and owing under the Agreement." *Id.* at ¶ 24.

After Aurora's September 14 termination notice and MARN's September 15 response, MARN alleges Aurora refused to respond to MARN's requests for accountings regarding orders "received by Aurora within the Territory both prior and subsequent to Aurora's" termination notice.  Doc. No. 1 at ¶ 25.

On January 3, 2024, MARN demanded in writing via certified mail that Aurora account for and pay all commissions due and owing to MARN. *Id.* at ¶ 26.  Aurora failed to respond, *id.*, and MARN filed this action on April 25, 2024. *See generally* Doc. No. 1.  On June 17, 2024,

---

[2] MARN and Aurora agreed to terminate the Business Development Fee in June 2022, eight months after Aurora acquired VI Manufacturing.  Doc. No. 1 at ¶ 19.

Aurora filed a motion to dismiss, or, in the alternative, to compel arbitration. *See generally* Doc. No. 22. Additionally, Aurora filed a motion to stay discovery on August 14, 2024. *See generally* Doc. No. 27. MARN filed its oppositions to the motion to dismiss or compel discovery and the motion to stay discovery on July 8, 2024 and September 4, 2024, respectively. *See generally* Doc. Nos. 25 and 28.

## II.    Standard of Review for Motion to Dismiss

"When deciding a motion to dismiss under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief." *Zuro v. Town of Darien*, 432 F. Supp. 3d 116, 121 (D. Conn. 2020) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996)). However, "[w]here a conclusory allegation in the complaint conflicts with a statement made in a document attached to the complaint, the document controls and the allegation is not accepted as true." *Francis v. Carusso*, 2022 WL 16716172, at *10 (D. Conn. Nov. 4, 2022) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 607 F. Supp. 2d 500, 502 (S.D.N.Y. 2009)). The "[f]actual allegations must be enough to raise a right to relief above the speculative level," and a plaintiff's "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.   Discussion of Motion to Dismiss

Aurora filed a motion to dismiss MARN's complaint for failure to state a claim, or, alternatively, to compel arbitration. *See* Doc. No. 22. As explained in further detail below, defendant's motion to dismiss is denied.

MARN brought four claims against Aurora.  In its motion to dismiss, Aurora argues that MARN failed to state a claim for counts one and two: breach of contract and the Commissions Act violation.  Doc. No. 22-1 at 1.

A. <u>Breach of Contract Claim</u>

"The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 (2014); *Maloney v. Connecticut Orthopedics*, P.C., 47 F. Supp. 2d 244, 249 (D. Conn. 1999); *see also American Express Centurion Bank v. Head*, 115 Conn. App. 10, 15-16 (2009).

MARN argues that, despite substantially performing its material obligations under the Agreement, Aurora materially breached the Agreement by:  (1) appointing one of Aurora's direct employees as a sales representative to solicit orders within the Territory, thus violating the exclusive rights and privileges granted to MARN; (2) wrongfully and unilaterally terminating the Agreement on September 14, 2023; (3) failing and refusing to account for and pay commissions on orders dated or communicated to Aurora both prior to and subsequent to Aurora's wrongful termination of the Agreement; (4) failing and refusing to pay commissions on blanket or requirements orders, as well as follow-on agreements to purchase Aurora's products arising from orders originally placed during the term of the Agreement; and (5) failing and refusing to pay commissions on orders for which MARN was the procuring cause and that were received subsequent to Aurora's wrongful termination of the Agreement.  Doc. No. 1 at ¶ 29.

In its motion to dismiss, Aurora claims that its purchase of VI Manufacturing did not shift the responsibilities and obligations under the Agreement from VI Manufacturing to Aurora.  Doc. No. 22-1 at 1, 4.  To support this proposition, Aurora cites the "well-settled" legal

conclusion that "[t]he mere transfer of the assets of one corporation to another corporation or individual generally does not make the latter liable for debts or liabilities of the first corporation." *Id.* at 4 (quoting *Altman v. Motion Water Sports, Inc.*, 722 F. Supp. 2d 234, 241 (D. Conn. 2010)) (cleaned up). Further, Aurora contends that paragraph 18 of the Agreement required MARN to provide written consent to Aurora's assumption of the Agreement. Doc. No. 22-1 at 1, 4. Paragraph 18 of the Agreement reads:

> [VI Manufacturing] may not assign (by operation of law or otherwise) or otherwise transfer this Agreement, or any right, duty or obligation hereunder, without [MARN's] prior written consent which shall not be unreasonably withheld or delayed. Subject to the foregoing, this Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Exhibit A, Doc. No. 1-1 at ¶ 18 ("Exhibit A"). Aurora argues that MARN's breach of contract claim must be dismissed because MARN did not properly allege the required written consent. Doc. No. 22-1 at 1, 4.

MARN argues that Aurora's liability is predicated on Aurora affirmatively seeking out MARN and assuming the Agreement rather than on a successor liability theory. Doc. No. 25 at 5. MARN claims that VI Manufacturing did not assign the agreement to Aurora, as paragraph 18 of the Agreement contemplates, but rather Aurora assumed the agreement "after consultation with MARN." *Id.* Further, MARN alleges it consented to Aurora assuming the Agreement through written communications, after which both parties "mutually performed upon the Agreement's obligations" for almost two years. *Id.* at 6. *See also* Doc. No. 1 ¶¶ 16-24.

Construing the allegations in the light most favorable to MARN, MARN has successfully alleged the existence of the Agreement, performance by both parties for over a year, Aurora's breach of the Agreement, and damages caused by Aurora's breach. MARN's complaint is not simply a "formulaic recitation of the elements" of a breach of contract. *Twombly*, 550 U.S. at 555. MARN adequately pleads the existence of the Agreement between VI Manufacturing and

MARN as well as Aurora's subsequent assumption of the Agreement. Doc. No. 1 ¶¶ 8-24. MARN's complaint explicitly alleges that MARN consented to Aurora's assumption of the agreement in "documents and communications exchanged between the parties." *Id.* at ¶ 17. Even if VI Manufacturing and MARN did not assign the Agreement to Aurora, as contemplated in paragraph 18 of the Agreement, the alleged conduct of the parties after Aurora acquired VI Manufacturing is sufficient to give rise to a contract between MARN and Aurora premised on Aurora's assumption of the terms established by the Agreement.[3] *See Hydro-Hercules Corp. v. Gary Excavating, Inc.*, 166 Conn. 647, 652 (1974) ("The intention of the parties manifested by their words and acts is essential to determine whether a contract was entered into and what its terms were.") (cleaned up).

According to MARN's complaint, MARN and Aurora "discussed sales representation and sales and marketing strategy" at an in-person meeting at Aurora's headquarters. Doc. No. 1 at ¶ 17. MARN claims that, at the meeting, Aurora requested MARN to schedule "visits [and] meetings with customers and prospects in the Territory." *Id.* MARN did so, and subsequently "provided its professional services to, at the request of, and for the benefit of Aurora, with its knowledge and consent." *Id.* Those alleged facts plausibly set forth MARN's consent to Aurora assuming the Agreement.

Additionally, Aurora's interactions and business with MARN were conducted according to the terms of the Agreement. Doc. No. 1 at ¶ 18-21. MARN was Aurora's "exclusive sales representative within the Territory pursuant to the Agreement." *Id.* at ¶ 18. For eight months

---

[3] For example, MARN and Aurora's agreement could be based on an implied contract with identical terms to the Agreement. *See Boland v. Catalano*, 202 Conn. 333, 337 (1987) ("Whether this contract is styled 'express' or 'implied' involves no difference in legal effect, but lies merely in the mode of manifesting assent.") (cleaned up); *Butler v. Solomon*, 127 Conn. 613, 615 (Conn. 1941) ("An implied contract would arise if the plaintiff rendered services, at the request of the defendant, under an expectation that they were to be paid for and if the defendant either intended to pay for them or the services were rendered under such circumstances that the defendant knew, or, as a reasonable person, should have known, that the plaintiff did expect payment.").

after acquiring VI Manufacturing, Aurora continued to pay MARN the Business Development Fee pursuant to paragraph seven of the Agreement until the parties mutually agreed to terminate the payments in June 2022.  *Id.* at ¶ 19; Exhibit A, Doc. No. 1-1 at ¶ 7.  After acquiring VI Manufacturing, Aurora paid MARN commissions on orders within the Territory at the rate specified in the Agreement.  Doc. No. 1 at ¶ 20.  Those orders included "both VI Manufacturing's pre-sale portfolio of products and services, as well as Aurora's products and services."  *Id.*  Finally, MARN alleges that Aurora advised MARN of its intent "to terminate the Agreement, effective immediately" on September 14, 2023.  *Id*. at ¶ 24.  Aurora's September 14 termination notice in and of itself strongly supports an inference that the parties had an effective contract.

Accepting the above facts as true, and drawing all reasonable inferences in favor of MARN, MARN plausibly alleges a claim for breach of contract.  *Zuro v. Town of Darien*, 432 F. Supp. 3d 116, 121 (D. Conn. 2020) ("When deciding a motion to dismiss under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief.").  Based on MARN's allegations, Aurora and MARN's course of conduct evinced a "mutual understanding" of "definite and certain" terms of a contract.  *Geary v. Wentworth Lab'ys, Inc.*, 60 Conn. App. 622, 627 (2000).  Aurora's alleged actions demonstrate the definite terms of its contract with MARN were entirely consistent with the Agreement.

Further, MARN plausibly alleges the final two elements of a breach of contract claim: breach by Aurora and damages stemming from that breach.  The Agreement states that, after its initial two-year term, it automatically renews for successive one-year terms absent notice from either party of their intention to terminate the Agreement.  Doc. No. 1 at ¶¶ 13-14; Exhibit A at

¶ 12(a).  The party seeking not to renew the agreement must notify the other party at least 90 days before the Agreement's initial two-year term ends.  Doc. No. 1 at ¶ 22; Exhibit A at ¶ 12(a).

MARN alleges Aurora did not provide written notice of its intention not to renew the Agreement prior to March 11, 2023, 90 days before "the June 9, 2023 expiration of the initial two-year term."  Doc. No. 1 at ¶ 23.  Instead, Aurora advised MARN on September 14, 2023 of "Aurora's decision to terminate the Agreement, effective immediately."  *Id.* at ¶ 24.  MARN responded in writing on September 15, 2023 indicating its willingness to perform under the Agreement and notifying Aurora that its termination constituted a breach of the Agreement.  *Id.* Aurora "refused to respond to MARN's repeated requests for accountings" and MARN's January 3, 2024 "written demand for payment."  *Id.* at ¶¶ 25-26.  Due to Aurora's alleged breach, MARN claims damages exceeding $75,000 based on commissions "due and owing" and prejudgment interest on unpaid commissions pursuant to Conn. Gen. Stat. § 37-3a(a).  *Id.* at ¶¶ 30-31.  Based on the above, MARN adequately pleads Aurora's breach of the Agreement and ensuing damages from that breach.

MARN's complaint pleads factual allegations sufficient to survive Aurora's motion to dismiss its breach of contract claim.  It is unnecessary to determine at this stage whether there is adequate evidence to support the alleged contract between MARN and Aurora, either due to successor-in-interest liability or Aurora's assumption of the agreement.  *Zuro*, 432 F. Supp. 3d at 121 ("A motion to dismiss for failure to state a claim under Rule 12(b)(6) is designed 'merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof.'") (citing *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities*, 748 F.2d 774, 779 (2d Cir. 1984)) (internal citation omitted).

Therefore, Aurora's motion to dismiss count one of MARN's complaint is **denied**.

B. <u>Violation of the Connecticut Sales Representatives' Commissions Act Claim</u>

MARN also asserts that Aurora violated the Connecticut Sales Representatives' Commissions Act ("the Commissions Act"), Conn. Gen. Stat. section 42-481, *et seq.*, by failing to pay MARN all commissions due and owing on, before, and after the date of its wrongful termination of its sales representative relationship with MARN. Doc. No. 1 at ¶¶ 37-38. MARN's claim includes commissions on orders for which MARN is the procuring cause and that were received both prior and subsequent to the wrongful termination date. *Id.* at ¶¶ 37-38. Additionally, MARN argues Aurora is presumed to have acted willfully and in bad faith by failing to respond to MARN's written demand for payment of all commissions due and owing within 30 days of receiving the demand. *Id.* at ¶ 41. MARN claims, therefore, it is entitled to an additional award of two times the full amount of commissions due and owed by Aurora under Conn. Gen. Stat. § 42-482(c). *Id.*

Aurora asserts the same arguments, as described in Section III.A. above, to argue MARN's Commissions Act claims should be dismissed. Doc. No. 22-1 at 1, 4. Specifically, Aurora argues that it did not assume VI Manufacturing's responsibilities under the Agreement and MARN did not properly allege its consent to Aurora assuming the Agreement. *Id.* In response, MARN emphasizes that its Commissions Act claim is entirely independent of Aurora's assumption of the Agreement and the parties' actions provide the basis for the claim. Doc. No. 25 at 7.

"Connecticut's commissions statute permits sales representative to sue to recover outstanding commissions after 'a contract between a principal and a sales representative is terminated.'" *Trade Links, LLC v. BI-QEM SA de CV*, 2020 WL 1335688, at *12 (D. Conn. Mar. 23, 2020) (quoting Conn. Gen. Stat. § 42-482(a)). The Commissions Act provides that, after a termination, the principal shall pay to the sales representative all commissions:

(1) [T]hat are due on or before the effective date of such termination, by the date specified in the contract or thirty days after the effective date of termination, whichever is later, and (2) that are due after the effective day of such termination, by the date specified in the contract but not later that (sic) thirty days after such commission becomes due under the terms of such contract.

Conn. Gen. Stat. § 42-482. Further, "[a]ny principal who wilfully, wantonly, recklessly or in bad faith fails to pay any commissions due . . . shall be liable in a civil action brought by a sales representative for twice the full amount of the commission owed to such sales representative."

*Id.*

Under the Commissions Act, "commission" means:

[C]ompensation that accrues to a sales representative, for payment by a principal, at a rate expressed as a percentage of the dollar amount of sales, orders or profits or any other method of compensation agreed to between a sales representative and principal including, but not limited to, fees for services and retainers[.]

Conn. Gen. Stat. § 42-481. A "principal" is person who: "(A) Manufactures, produces, imports, sells or distributes a product or service, (B) establishes a business relationship with a sales representative to solicit orders for a product or service, and (C) compensates a sales representative, in whole, or in part, by commission[.]" *Id.* (defining person to include "an individual, corporation, limited liability company, partnership, unincorporated association, trust or estate"). A "sales representative" is a person who: "(A) Establishes a business relationship with a principal to solicit orders for products or services, and (B) is compensated in whole, or in part, by commission." *Id.* "Termination" means ending the business relationship between a sales representative and a principal. *Id.*

MARN's complaint alleges that Aurora is a "principal" under the Commissions Act because Aurora: "(i) manufactures, produces, sells or distributes products or services; (ii) established a business relationship with a sales representative, to solicit orders for Aurora's products and services, and (iii) compensated its sales representative, MARN, in whole or in part,

by commission." Doc. No. 1 at ¶ 33.  MARN further alleges that it is a sales representative, as defined by the Commissions Act, because it:  "(i) established a business relationship with [Aurora] to solicit orders for products and services, and (ii) was compensated in whole or in part, by commissions." *Id.* at ¶ 35.  Finally, MARN alleges that "Aurora established a business relationship with MARN to solicit orders for products and services throughout [the Territory]" then "violated the Commissions Act by failing to pay MARN all commissions due and owing" before, on, and after the date Aurora wrongfully terminated its business relationship with MARN. *Id.* at ¶¶ 36-38.

MARN adequately alleges that Aurora and MARN established a business relationship falling under the Commissions Act.  Doc. No. 1 at ¶¶ 16-21.  MARN also sufficiently pleads Aurora's termination of their business relationship, and the Agreement, via Aurora's September 14, 2023 termination notice. *Id.* at ¶ 24.  Further, MARN describes Aurora's failure to pay commissions in accordance with the Commissions Act after Aurora terminated the Agreement. *Id.* at ¶¶ 24-26.

Accepting MARN's factual allegations as true and drawing all reasonable inferences in its favor, MARN pleads a plausible Commissions Act violation. *See Zuro v. Town of Darien*, 432 F. Supp. 3d 116, 121 (D. Conn. 2020).  Therefore, I **deny** Aurora's motion to dismiss count two of MARN's complaint.

## IV.    Standard of Review for Motion to Compel Arbitration

Alternatively, Aurora argues that if MARN's breach of contract and Commissions Act claims are not dismissed, then this Court should compel arbitration and dismiss this action or stay it pending arbitration.  Doc. No. 22-1 at 5-6.

The Federal Arbitration Act ("FAA") embodies "a national policy favoring arbitration" as an alternative to litigation and requires enforcing arbitration agreements. *Ligeri v. Amazon.com Inc.*, 2024 WL 839231, at *1 (D. Conn. Feb. 28, 2024) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 228 (2d Cir. 2016)). The FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. *See Whitaker v. Clear Channel Broad., Inc.*, 2005 WL 3478352, at *2 (D. Conn. Dec. 19, 2005). Courts look to four factors to determine whether to compel arbitration pursuant to the FAA:

> 1) [W]hether the parties agreed to arbitrate their dispute; 2) whether the asserted claims fall within the scope of the arbitration agreement; 3) whether Congress intended the federal statutory claims asserted by the plaintiff, if any, to be non-arbitrable, and 4) if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the remaining claims pending arbitration.

*Morales v. Rent-A-Ctr., Inc.*, 306 F. Supp. 2d 175, 179 (D. Conn. 2003). Only steps one and two apply to the current analysis because MARN does not assert federal statutory claims against Aurora. *See* Doc. No. 1 at 6-13. *See also Billie v. Coverall N. Am., Inc.*, 444 F. Supp. 3d 332, 343 (D. Conn. 2020) (reiterating the four factors and using the first two factors to decide whether to compel arbitration).

"Courts deciding motions to compel [arbitration] apply a 'standard similar to that applicable for a motion for summary judgment.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Nicosia*, 834 F.3d at 229) (cleaned up). In deciding a motion for summary judgment, courts "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits." *Nicosia*, 834 F.3d at 229 (quoting *Chambers v. Time Warner, Inc.*,

282 F.3d 147, 155 (2d Cir. 2002)) (internal quotation marks omitted).  Additionally, "the court must draw all reasonable inferences in favor of the non-moving party."  *Nicosia*, 834 F3.d at 229.

## V.     Discussion of Motion to Compel Arbitration

"A motion to compel arbitration requires a court to consider at the outset whether the parties have actually agreed to arbitrate."  *Green v. XPO Last Mile, Inc.*, 504 F. Supp. 3d 60, 66 (D. Conn. 2020).  A federal court must determine whether "a valid agreement or obligation to arbitrate exists" and "one party to the agreement has failed, neglected or refused to arbitrate."  *Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120 (2d Cir. 2003) (internal quotation marks and citation omitted).  "Although the FAA evidences a strong presumption in favor of arbitration as to the scope of arbitrable issues, that policy only comes into play after it is determined that the contracting parties have an enforceable arbitration clause."  *Whitaker*, 2005 WL 3478352, at *3 (cleaned up).  A dispute is arbitrable when "the parties agreed to arbitrate" and "the scope of that agreement encompasses the claims at issue." *Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391, 394 (2d Cir. 2015) (cleaned up).

"[A]rbitration remains a creature of contract," and whether the parties agreed to arbitrate the underlying dispute is a question "governed by state-law principles of contract formation." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019).  *See also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter . . . [courts] should apply ordinary state-law principles that govern the formation of contracts."); *Meyer*, 868 at 74 (2d Cir. 2017) ("State law principles of contract formation govern the arbitrability question.") (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d at 231).

The Agreement that Aurora argues requires this Court to compel arbitration contains a choice-of-law provision specifying that Connecticut state law will govern the Agreement. Exhibit A, Doc. No. 1-1 at ¶ 19 ("This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut without regard to conflicts of law provisions."). The "essential elements of contract formation" under Connecticut state law are offer and acceptance. *D'Antuono v. Serv. Rd. Corp.*, 789 F. Supp. 2d 308, 322 (D. Conn. 2011). *See also Auto Glass Express, Inc. v. Hanover Ins. Co.*, 293 Conn. 218, 227 (2009) ("The rules governing contract formation are well settled. . . . [A]n offer imposes no obligation upon either party, until it is accepted by the offeree, according to the terms in which the offer was made.") (internal quotation marks and citation omitted).

"In Connecticut, the fact that a party signed a written agreement is usually conclusive evidence of contract formation." *D'Antuono v. Serv. Rd. Corp.*, 789 F. Supp. 2d at 323; *Morales*, 306 F. Supp. 2d at 181 (D. Conn. 2003) ("In this case, Plaintiff actually signed the arbitration agreement at issue, which serves as presumptive evidence that an agreement was formed.").

MARN signed the Agreement containing the arbitration clause. Exhibit A, Doc. No. 1-1 at 7-8 ("Exhibit A"). MARN's signature on the Agreement is strong evidence that MARN intended to be bound by the Agreement, including the arbitration clause located in paragraph 19 of the Agreement. The arbitration clause in the Agreement states:

> In the event of a dispute, claim or controversy (a "Dispute") under or arising out of this Agreement, either party may initiate arbitration of the Dispute before a single arbitrator pursuant to the then-current rules of the American Arbitration Association for commercial arbitration, with the hearing to be held in Waterbury, Connecticut. The award of the arbitrator may be enforced in any court of competent jurisdiction. Each party shall bear its own fees and expenses of arbitration and one-half of the fees of the arbitrator, subject to the power of the arbitrator to award all or any part of reasonable fees, costs and expenses (including reasonable attorneys' fees) to the substantially prevailing party. Notwithstanding the foregoing, in the event of an arbitral award pursuant to which

Representative is awarded unpaid Commissions hereunder, Manufacturer shall bear its own costs and expenses as well as those of the arbitrator and Representative.

Exhibit A at ¶ 19.

Neither party denies the existence of an arbitration clause in paragraph 19 of the Agreement.  Doc. No. 22-1 at 6 ("[I]it is readily apparent that if the Representative Agreement is valid and enforceable, then the arbitration clause contained in Paragraph 19 would be contractually valid and the parties' dispute—for payment of commissions—would be squarely within the scope of a dispute arising out of the Representative Agreement."); Doc. No. 25 at 10. Instead, the parties dispute whether the arbitration clause mandates this Court to compel arbitration once a party requests it and without both parties' consent.

MARN does not contest that it is bound by the arbitration clause within the Agreement, nor that the current dispute is one that falls within the scope of the Agreement.  Instead, MARN argues that the arbitration provision is *permissive*, rather than *mandatory*.  Doc. No. 25 at 8, 10. MARN asserts that "the phrase 'may arbitrate' does not denote a mandatory obligation and is not a proper basis to compel arbitration" under Connecticut law.  Doc. No. 25 at 8.  In response, Aurora claims that the plain language of the arbitration clause means that "*either* party can initiate arbitration if it elects to do so."  Doc. No. 26 at 1 (emphasis in original).  Aurora maintains the language is permissive in that it allows either party to compel arbitration, but, once a party requests arbitration, it becomes mandatory.  *Id.* at 1-3.  According to Aurora, interpreting the arbitration clause to require MARN's consent would "render the arbitration clause meaningless and superfluous."  *Id.* at 1-2.

Determining whether this Court must compel arbitration requires interpreting what the parties intended the phrase "either party may initiate arbitration" to mean.  Exhibit A at ¶ 19. Contract interpretation rests on "principles applicable to all contracts generally," and, therefore,

17

"is controlled by state contract law, rather than by federal case law construing the [federal] arbitration act." *Hottle v. BDO Seidman LLP*, 268 Conn. 694, 701 (2004) (holding an arbitration clause to be enforceable under New York state law).

"Connecticut has adopted a clear public policy in favor of arbitrating disputes." *Nussbaum v. Kimberly Timbers, Ltd.*, 271 Conn. 65, 71 (2004). *See also* Conn. Gen. Stat. § 52-408.[4] "When parties have a valid arbitration agreement, the courts are empowered to direct compliance with its provisions." *MSO, LLC v. DeSimone*, 313 Conn. 54, 63 (2014) (Internal quotation marks and citation omitted.). The parties' intentions, as determined from the language in the arbitration agreement, control whether a dispute arising from a contract must be submitted to arbitration. *Chabad Lubavitch of W. & S. New England, Inc. v. Shemtov*, 349 Conn. 695, 707 (2024); *See also Auto Glass Exp., Inc.*, 293 Conn. at 225 ("It is a fundamental principle of contract law that the existence and terms of a contract are to be determined from the intent of the parties. . . . The parties' intentions manifested by their acts and words are essential to the court's determination of whether a contract was entered into and what its terms were.") (cleaned up); *FPJ Invs., LLC v. Ameritx, LLC*, 2006 WL 2556409, at *1 (Conn. Super. Ct. Aug. 11, 2006) (interpreting an arbitration clause by determining the parties' intent as evidenced by the wording of the arbitration clause). However, "arbitration agreements are to be strictly construed and such agreements should not be extended by implication." *Wesleyan Univ. v. Rissil Const. Assocs., Inc.*, 1 Conn. App. 351, 355 (1984).

---

[4] Conn. Gen. Stat. § 52-408 provides: "An agreement in any written contract, or in a separate writing executed by the parties to any written contract, to settle by arbitration any controversy thereafter arising out of such contract, or out of the failure or refusal to perform the whole or any part thereof, or a written provision in the articles of association or bylaws of an association or corporation of which both parties are members to arbitrate any controversy which may arise between them in the future, or an agreement in writing between two or more persons to submit to arbitration any controversy existing between them at the time of the agreement to submit . . . *shall* be valid, irrevocable and enforceable, except when there exists sufficient cause at law or in equity for the avoidance of written contracts generally . . . ." (emphasis added).

Courts applying Connecticut law to interpret arbitration clauses hold that the usage of "may" as opposed to "shall" in arbitration clauses indicates the parties' intent to "permit, and perhaps even encourage, arbitration, but . . . not to compel arbitration of disputes." *FPJ Invs., LLC*, 2006 WL 2556409, at *1 (denying a motion to compel arbitration when the arbitration clause stated "[i]n the event that any dispute shall arise . . . such dispute *may* be submitted to a board of arbitrators.") (emphasis in original). In *A. Dubreuil & Sons, Inc. v. Town of Lisbon*, the parties amended a standard contract form to read: "All claims disputes and other matters in question . . . *may* be decided by arbitration . . . ." 215 Conn. 604, 607 (1990) (emphasis in original). The Supreme Court of Connecticut held that deliberately substituting the word "may" for the word "shall," was "an indication that the parties expressly intended something other than mandatory arbitration." *Id.* at 611. Further, it was reasonable for the trial court to determine the parties intended for arbitration to be "consensual rather than mandatory" because "may" is not usually used as a command word and "shall" was intentionally removed. *Id.*

The cases Aurora cites to support its contention that "once a party requests arbitration, it becomes required" are distinguishable from the Agreement's arbitration clause. Doc. No. 26 at 3. Some of those cases do not apply Connecticut state law to interpret the arbitration clause at issue. *See Travelport Glob. Distribution Sys. B.V. v. Bellview Airlines Ltd.*, 2012 WL 3925856, at *3-5 (S.D.N.Y. Sept. 10, 2012) (interpreting an arbitration provision governed by New York law and using the phrase "may be submitted to arbitration" to trigger mandatory arbitration); *Hottle*, 268 Conn. at 696 (holding, under New York state law, that an arbitration clause authorizing an arbitration panel consisting solely of directors and partners of one of the parties is valid and enforceable).

For example, in *Can Cap. Asset Servicing, Inc. v. Trinity Battery, Inc.*, the court applied Utah state law to interpret an arbitration clause as allowing either party to elect to resolve the dispute through arbitration, even if one of the parties had "already commenced suit in court." 2016 WL 8135422, at *3-5, 9 (Conn. Super. Ct. Dec. 27, 2016) (granting defendants' motion to compel arbitration and staying proceedings). However, the arbitration clause was more restrictive than the one MARN signed. *Id.* at *3 ("If either of us elects to resolve a dispute by arbitration, this means that neither you nor we will be able to have the dispute settled by a court or jury trial or to participate in a class action or class arbitration."). The court held "the plain language" of the arbitration clause made it "mandatory[,] because once either party elects arbitration, *neither* party can have the dispute settled by a court or jury trial." *Id.* at *5 (emphasis in original) (cleaned up).

Several of the cases Aurora cites were decided prior to *Dubreuil* and involve interpreting dispute resolution procedures in collective bargaining agreements. Aurora cites *Allis-Chalmers Corp. v. Lueck* for the proposition that "the permissive 'may' is not sufficient to overcome the presumption that parties are not free to avoid the contract's arbitration procedures." 471 U.S. 202, 204 n.1 (1985) (cleaned up). However, *Allis-Chalmers Corp.* did not involve a motion to compel arbitration. Further, the Supreme Court's statement referred to a special grievance procedure involving a "Joint Plan insurance Committee" with the authority to resolve all disability grievances arising from the collective bargaining agreement. *Id.* at 204. The collective bargaining agreement provision was much more detailed than the one in the Agreement. *Id.* at 204 n.1 ("Questions within the [Joint Plant Insurance] Committee's scope shall be referred to it, and shall not be processed in the first three steps of the grievance procedure . . . , but may be

20

presented for arbitration in the established manner once they have been discussed and have not been resolved.").

Second Circuit precedent acknowledges a "clear national policy favoring resolution of labor disputes in private, extra-judicial fora" superimposed upon "traditional contract notions." *Gangemi v. Gen. Elec. Co.*, 532 F.2d 861, 865 (2d Cir. 1976). Further, the Supreme Court has a "well settled preference for arbitration of labor disputes . . . by presuming that a broad arbitration clause applies . . . . Doubts should be resolved in favor of coverage.'"[5] *Id. See also United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 567 (1960) ("In our role of developing a meaningful body of law to govern the interpretation and enforcement of collective bargaining agreements, we think special heed should be given to the context in which collective bargaining agreements are negotiated and the purpose which they are intended to serve.").

Notably, those cases do not use state law to interpret the arbitration clauses within collective bargaining agreements and instead refer to federal labor-law principles, signaling a different analysis than in the current dispute.[6] *See generally Loc. 771, I.A.T.S.E., AFL-CIO v. RKO Gen., Inc. WOR Div.*, 546 F.2d 1107, 1109, 1113-16 (2d Cir. 1977) (using federal labor-law to uphold an arbitrator's award).

Connecticut state courts, applying Connecticut state law, consistently hold that arbitration agreements using the word "may" allow for arbitration, but do not require courts to compel arbitration once a party to the agreement files a complaint in court. *Norwalk Marine*

---

[5] The Supreme Court also recognizes that the "grievance machinery" under collective bargaining agreements functions differently than a normal contractual relationship: "Apart from matters that the parties specifically exclude, all of the questions on which the parties disagree must therefore come within the scope of the grievance and arbitration provisions of the collective agreement." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 578, 581 (1960).

[6] "[T]he grievance-arbitration process was well recognized as a fundamental cornerstone to the bargaining process, promoting an important goal underlying both state and federal labor policy." *City of Hartford v. Hartford Mun. Emps. Ass'n*, 259 Conn. 251, 265 (2002).

*Contractors, Inc. v. Mattern Constr., Inc.*, 2023 WL 3839930, at *3-4 (Conn. Super. Ct. May 30, 2023) (holding an arbitration clause reading "either party may bring the dispute before an alternative dispute resolution entity for resolution" did not require the court to stay the case pending arbitration after the parties had already engaged in lengthy litigation). *See also Mazal v. Inst. for Advancement of Persons*, 1996 WL 411987, at *1-2 (Conn. Super. Ct. July 3, 1996) (holding an arbitration clause stating any dispute "*may* be submitted to arbitration by either party . . . merely gives Mazal the right to demand arbitration" and does not imply arbitration is a condition precedent to litigation) (emphasis in original); *Dicesare-Bentley v. City of New London*, 1990 WL 283866, at *1 (Conn. Super. Ct. Aug. 3, 1990) (denying a motion to dismiss because the parties' use of the phrase "may arbitrate" in their contract did not deprive the court of subject matter jurisdiction and raised "the inference that arbitration was not meant to be mandatory").

Although Aurora correctly recites the strong policy favoring arbitration under federal and Connecticut law, it references no cases contradicting the central holding of the Connecticut Supreme Court's decision in *Dubreuil*. *See Discover Re Managers, Inc. v. Preferred Emplrs. Group, Inc.*, 2006 U.S. Dist. LEXIS 97836, at *6, *27-28 (D. Conn. Mar. 1, 2006) (holding an arbitration clause stating "Company and Manager may elect Arbitration as a remedy" as requiring the consent of both parties to proceed to arbitration); *Nussbaum*, 271 Conn. at 73 (compelling arbitration where the arbitration clause at issue stated "any controversy or claim arising out of or relating to this Contract . . . *shall* be settled by arbitration." (emphasis added)). The only case this Court has found that deviates slightly from *Dubreuil's* holding involved an agreement expressly stating, "[t]he election to arbitration *may* be made even if an action has been filed in court." *Bohen v. Chase Manhattan Auto. Fin. Corp.*, 2004 WL 1463014, at *2-4 (Conn.

Super. Ct. June 8, 2004) (compelling arbitration where the agreement provided either party "*may choose* to have the Dispute resolved by binding arbitration") (emphasis in original).

"While the intent of the parties in *Dubreuil* was even clearer because the word 'may' had been substituted in an addendum for the word 'shall,' it remains true that the word 'may' is not normally a word of command, but rather generally imports permissive conduct." *FPJ Invs., LLC v. Ameritx, LLC*, 2006 WL 2556409, at *1 (Conn. Super. Ct. Aug. 11, 2006) (citing *A. Dubreuil & Sons, Inc.*, 215 Conn. at 611.[7] An arbitration provision stating the parties *may* resolve disputes by arbitration indicates an intent for arbitration to be permitted at the request of either party rather than required when requested by either party.

Construing all the facts in the parties' pleadings in the light most favorable to MARN, resolving all ambiguities against Aurora, and applying Connecticut state contract law to the Agreement's arbitration clause, I deny Aurora's motion to compel arbitration. Under Connecticut case law, the use of the word "may" rather than "shall" in an arbitration clause does not require a court to compel arbitration when one of the parties has already initiated litigation in court.

Because I **deny in full** Aurora's motion to compel arbitration, I do not find it necessary to decide MARN's argument that counts two, three, and four of its complaint, are not subject to

---

[7] Conversely, courts applying Connecticut law *do* compel arbitration when arbitration clauses use the word "shall." *See D'Antuono v. Serv. Rd. Corp.*, 789 F. Supp. 2d 308, 314, 316 (D. Conn. 2011) (compelling arbitration when the arbitration clause stated all disputes "shall be exclusively decided by binding arbitration); *Chabad Lubavitch of W. & S. New England, Inc. v. Shemtov*, 349 Conn. 695, 697-99, 712-13 (2024) (compelling arbitration when the agreement stated the parties shall adjudicate disputes before a panel of rabbinical judges); *Coburn v. Grabowski*, 1997 WL 309572, at *3 (Conn. Super. Ct. May 29, 1997) ("It is clear here, unlike in the *Dubreuil* case, that the presence of the word *shall* in the mediation clause constitutes an implicit intent that participation in mediation is mandatory.") (emphasis in original); *Goldberg v. Goodwill Indus.*, 2006 WL 224124, at *8-9 (Conn. Super. Ct. Jan. 3, 2006) (compelling arbitration when arbitration clause stated any claim arising out of the employment agreement shall be settled by arbitration); *Wells Fargo Bank, N.A. v. Santamaria*, 2023 WL 8230390, at *1-3 (Conn. Super. Ct. Nov. 21, 2023) (compelling arbitration where an agreement plainly stated any dispute shall be resolved by arbitration).

arbitration provision because those claims do not arise from the Agreement. *See generally* Doc. No. 25. at 11-13.

## VI.    Motion to Stay Discovery

After filing its motion to dismiss or compel arbitration, Aurora filed a motion to stay discovery on August 14, 2024. *See* Doc. No. 27. In its motion, Aurora argues there is good cause to stay discovery because it may waive arbitration if it engages in "judicial discovery procedures not available in arbitration." Doc. No. 27-1 at 2 (quoting *Dome Tech., LLC v. Golden Sands Gen. Contractors, Inc.*, 2017 WL 11577923 (D. Conn. July 24, 2017)) (cleaned up). The possibility of impending arbitration no longer exists. Therefore, because Aurora's motion to dismiss or compel arbitration is denied, doc. no. 22, Aurora's motion to stay discovery is **denied as moot**.

## VII.    Conclusion

For the foregoing reasons, Aurora's motion to dismiss or compel arbitration, doc. no. 22, is **denied** and Aurora's motion to stay discovery, doc. no. 27, is **denied as moot**.

So ordered.

Dated at Bridgeport, Connecticut, this 27th day of February 2025.


/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge